# FILED

November 3 2009

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

DA 08-0307

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 368

CATHERINE SATTERLEE,

        Petitioner and Appellant,

    v.

LUMBERMAN'S MUTUAL CASUALTY COMPANY,
Insurer for BUTTREY FOOD & DRUG,

        Employer and Appellee.

-------------------------------------------------------------------------------------

JAMES ZENAHLIK,

        Petitioner and Appellant,

    v.

MONTANA STATE FUND, Insurer for
EAGLE ELECTRIC,

        Employer and Appellee.

-------------------------------------------------------------------------------------

JOSEPH FOSTER,

        Petitioner and Appellant,

    v.

MONTANA STATE FUND, Insurer for
ALLEN ELECTRIC,

        Employer and Appellee.

APPEAL FROM:    Workers' Compensation Court,
                       Cause No. WC 2003-0840
                       Honorable James Jeremiah Shea, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

James G. Hunt (argued); Hunt Law Firm; Helena, Montana

Thomas J. Murphy (argued); Murphy Law Firm; Great Falls, Montana

For Appellees:

Michael P. Heringer, Jon A. Wilson; Brown Law Firm, P.C.;
Billings, Montana (for Lumberman's Mutual Casualty Company)

Steven W. Jennings; Crowley, Haughey, Hanson, Toole & Dietrich,
PLLP; Billings, Montana (for Intervening Insurers)

Bradley J. Luck (argued); Garlington, Lohn, & Robinson, PLLP;
Missoula, Montana (for Montana State Fund)

Oliver H. Goe; Browning, Kaleczyc, Berry, & Hoven; Helena, Montana
(for Montana Municipal Insurance Authority, Montana Association of
Counties and Montana Schools Group Insurance Authority)

For Amici Curiae:

Jon. W. Bennion; Attorney at Law; Helena, Montana (for Montana
Chamber of Commerce, Montana Contractors' Association, Inc., and
the National Federation of Independent Business Small Business Legal
Center)

Argued: June 10, 2009
Submitted: June 16, 2009
Decided: November 3, 2009

Filed:

_____
Clerk

2

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Appellant Satterlee appeals from the Montana Workers' Compensation Court's (WCC) November 15, 2006 "Order Denying Petitioners' Motion to Allow Discovery and Granting Respondents' Cross-Motion for Partial Summary Judgment" and the WCC's June 4, 2008 "Order Granting Respondent Montana State Fund's Motion for Partial Summary Judgment."

¶2 We consider the following issues on appeal:

¶3 Did the Worker's Compensation Court err in determining that § 39-71-710, MCA, does not violate Satterlee's right to equal protection?

¶4 Did the Workers' Compensation Court err in determining that § 39-71-710, MCA, does not violate Satterlee's substantive due process right?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5 Three individuals, Catherine Satterlee, James Zenahlik and Joseph Foster (collectively Satterlee) all suffered work-related injures, which resulted in permanent total disability (PTD). Because of the injuries, Satterlee began to receive PTD benefits. When Satterlee became eligible for Social Security Retirement Insurance (SSRI), pursuant to § 39-71-710, MCA, the PTD benefits terminated.

¶6 Satterlee first challenged the constitutionality of § 39-71-710, as it applied to PTD benefits, in 2005 in the WCC. In its 2005 "Order Denying Motion for Partial Summary Judgment," the WCC held the statute to be constitutional as applied to PTD benefits.[1]

---

[1] *Satterlee v. Lumberman's Mut. Cas. Co. et al.*, 2005 MTWCC 55

Satterlee appealed and this Court dismissed the appeal without prejudice because the order fell short of a final judgment[2] and identified two remaining unresolved issues to be decided by the WCC: 1) Whether § 39-71-710, MCA, violates Satterlee's right to due process; and 2) Whether § 39-71-710, MCA, unconstitutionally or impermissibly discriminates against Satterlee based on age.

¶7    In January 2006, Satterlee moved for reconsideration of the WCC's 2005 order denying Satterlee's motion for partial summary judgment. The WCC granted Satterlee's motion for reconsideration and granted Satterlee leave to file a motion and brief requesting additional discovery, pursuant to M. R. Civ. P. 56(f). However, in its order granting Satterlee leave, the WCC noted that its previous analysis of the constitutionality of § 39-71-710, MCA, as it related to PTD benefits, "was not grounded on the specific economic analyses proffered by [Lumberman's]." However, the WCC noted that it did factor into its analysis that "providing PTD benefits to injured workers beyond the time they were eligible for retirement benefits had a general negative economic impact on the workers' compensation system." After entertaining arguments regarding whether additional discovery pertaining to specific economic impacts of a ruling on the constitutionality of § 39-71-710, MCA, in its 2006 order, the WCC denied Satterlee's motion to allow discovery and granted Lumberman's cross-motion for partial summary judgment. The WCC explained that its previous constitutional analysis "was not grounded on the specific economic analyses proffered by [Satterlee]" and it was not

---

[2] See M. R. Civ. P. 54(b)

4

persuaded that additional discovery regarding economic costs would preclude summary judgment in favor of Lumberman's.

¶8    Montana State Fund then moved the WCC for partial summary judgment on the two remaining issues identified by this Court.  In 2008, the WCC granted Montana State Fund's motion for summary judgment.[3]  Satterlee appeals.

## STANDARD OF REVIEW

¶9    In reviewing the WCC's grant or denial of summary judgment, this Court uses the same standard used in ruling upon a motion for summary judgment; we determine whether there is an absence of genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law.  *Otteson v. Mont. State Fund*, 2005 MT 198, ¶ 8, 328 Mont. 174, 119 P.3d 1188.

¶10    The issues before us involve questions of constitutional law.  The standard for reviewing conclusions of law is whether they are correct.  *Henry v. State Compen. Ins. Fund*, 1999 MT 126, ¶ 10, 294 Mont. 448, 982 P.2d 456.

> The constitutionality of a legislative enactment is prima facie presumed, and every intendment in its favor will be presumed, unless its unconstitutionality appears beyond a reasonable doubt.  The question of constitutionality is not whether it is possible to condemn, but whether it is possible to uphold the legislative action which will not be declared invalid unless it conflicts with the constitution, in the judgment of the court, beyond a reasonable doubt.

*Powell v. State Compen. Ins. Fund*, 2000 MT 321, ¶ 13, 302 Mont. 518, 15 P.3d 877.

The party challenging the constitutionality of a statute bears the burden of proving the

---

[3] *Satterlee v. Lumberman's Mut. Cas. Co., et al.*, 2008 MTWCC 29

5

statute unconstitutional beyond a reasonable doubt. *Henry*, ¶ 11. If any doubt exists, it must be resolved in favor of the statute. *Powell*, ¶ 13.

## DISCUSSION

¶11 The issue before the Court is the constitutionality of § 39-71-710, MCA. Satterlee claims the statute is unconstitutional because it denies PTD benefits to Satterlee and other similarly situated individuals on the basis of their age. Satterlee argues that, based on our holding in *Reesor v. Mont. State Fund*, 2004 MT 370, 325 Mont. 1, 103 P.3d 1019, "the Court should find that § 39-71-710, MCA, violates the Equal Protection and Substantive Due Process Clauses of the Montana Constitution and illegally discriminates based on age." Appellee insurance companies urge this Court to uphold the WCC's decision finding § 39-71-710, MCA, to be constitutional, as it is applied to PTD benefit recipients who become eligible for SSRI benefits.

¶12 The declaration of policy supporting the Workers' Compensation Act (WCA) states:

> [a]n objective of the Montana workers' compensation system is to provide, without regard to fault, wage-loss and medical benefits to a worker suffering from a work-related injury or disease. Wage-loss benefits are not intended to make an injured worker whole but are intended to assist a worker at a reasonable cost to the employer. Within that limitation, the wage-loss benefit should bear a reasonable relationship to actual wages lost as a result of a work-related injury or disease. § 39-71-105(1), MCA.

Section 39-71-710, MCA, provides:

> [T]ermination of benefits upon retirement. (1) If a claimant is receiving disability or rehabilitation compensation benefits and the claimant receives social security retirement benefits or is eligible to receive or is receiving full social security retirement benefits or retirement benefits from a system

that is alternative to social security retirement, the claimant is considered to be retired. When the claimant is retired, the liability of the insurer is ended for payment of permanent partial disability benefits other than the impairment award . . . and medical benefits. (2) If a claimant who is eligible under subsection (1) to receive retirement benefits and while gainfully employed suffers a work-related injury, the insurer retains liability for temporary total disability benefits, any impairment award, and medical benefits.

¶13 Workers become eligible for SSRI when they reach full retirement age and have enough social security earnings to be fully insured. 20 C.F.R. § 404.310 (2009). Full retirement age has traditionally been 65 years. However, this age is gradually being increased based on an individual's date of birth. Under the current regulatory scheme, the full retirement age for individuals born after January 1, 1960 is 67 years. 20 C.F.R. § 404.409(a) (2009). Therefore, for the purposes of applying § 39-71-710, MCA, an individual will reach the age of "retirement" between the ages of 65 and 67 depending on his or her date of birth. With this understanding of the interplay between SSRI and PTD benefits we now turn to the issues at bar.

¶14 1. Did the Workers' Compensation Court err in determining that § 39-71-710, MCA, does not violate Satterlee's right to equal protection?

¶15 Article II, Section 4 of the Montana Constitution provides that "[t]he dignity of the human being is inviolable. No person shall be denied the equal protection of the laws." "The basic rule of equal protection is that persons similarly situated with respect to a legitimate governmental purpose of the law must receive like treatment." *Rausch v. State Compen. Ins. Fund*, 2005 MT 140, ¶ 18, 327 Mont. 272, 114 P.3d 192 (*Rausch II*) (citing *Powell*, ¶ 22). In addressing an equal protection challenge, this Court follows a three-

7

step process. *Henry*, ¶ 27. First, we must identify the classes involved and determine whether they are similarly situated. *Henry*, ¶ 27. The WCC adopted the *Reesor* court's classification, which identified the two classes in *Reesor* as "(1) PPD eligible claimants who receive or are eligible to receive social security retirement benefits; and (2) PPD claimants who do not receive and are not eligible to receive social security retirement benefits." *Reesor*, ¶ 10. The parties do not dispute this approach to classification. Thus, we agree with the WCC's determination that, for the purposes of an equal protection analysis, the two classes represented here are defined as: (1) PTD eligible claimants who receive or are eligible to receive social security retirement benefits; and (2) PTD claimants who do not receive and are not eligible to receive social security retirement benefits. Having identified the classes we must now determine whether they are similarly situated. *Henry*, ¶ 27.

¶16 The WCC determined that the two classes were similarly situated because "both classes have suffered work-related injuries, are unable to return to their time-of-injury jobs, have permanent physical impairment ratings, and must rely on section 39-71-702, MCA, as their exclusive remedy under Montana law." Satterlee agrees with the WCC's determination and asserts that "[f]or equal protection purposes, the *Reesor* classes and the Satterlee classes are identical. The single discriminating factor between the classes in both cases is age." While several of the Appellee insurers agree with the WCC's determination that the classes are similarly situated, Montana State Fund argues that age is not the only differentiating factor because "[m]any claimants over age 65 do and will

8

continue to receive PTD benefits." While it may be that some individuals will continue to receive PTD benefits after reaching age 65, it does not follow that both classes are not similarly situated. Those individuals who are able to maintain their PTD benefits do so only because they do not have enough social security earnings to be considered insured for the purposes of qualifying for SSRI. Here, just as in *Reesor*, both classes have suffered work-related injuries, are unable to return to their time-of-injury jobs, have permanent physical impairment ratings, and must rely on § 39-71-702, MCA, as their exclusive remedy under Montana Law. Although § 39-71-710, MCA, does not specify a particular age, it is still triggered by operation of SSRI regulations that do. In short, it applies only to claimants who are "retired," which is defined as a claimant who "receives social security retirement benefits or is eligible to receive or is receiving full social security retirement benefits or retirement benefits from a system that is an alternative to social security retirement . . . ." Section 39-71-710, MCA. Under this framework, the claimant's age, as defined by the eligibility requirements of receiving SSRI benefits, is the only identifiable differentiating factor between the two classes. As such, we agree with the WCC's determination that the classes are similar.

¶17 The next step in addressing an equal protection challenge is to determine the appropriate level of scrutiny to apply to the challenged legislation. *Henry*, ¶ 29. In doing so, we must determine whether a suspect classification is involved or whether the nature of the individual interest involves a fundamental right, either of which would trigger a strict scrutiny analysis. *Henry*, ¶ 29. We have previously stated:

9

> [t]he right to receive Workers' Compensation benefits is not a fundamental right which would trigger a strict scrutiny analysis of equal protection. Nor does this statute infringe upon the rights of a suspect class. When a right determined to be less than fundamental is infringed upon by a classification, the test applied by this Court is the rational relationship test. That is, does a legitimate governmental objective bear some identifiable rational relationship to a discriminatory classification.

*Stratemeyer v. Lincoln Co.*, 259 Mont. 147, 151, 855 P.2d 506, 509 (1993) (*Stratemeyer I*) (citing *Cottrill v. Cottrill Sodding Serv.*, 229 Mont. 40, 42-43, 744 P.2d 895, 897 (1987)). As described above, rational basis review is the traditional level of scrutiny applied to equal protection analyses of workers' compensation statutes. Satterlee, however, urges us to apply a middle-tier analysis "given the rare combination of age discrimination and the total loss of workers' compensation benefits found in the present statute." We apply middle-tier scrutiny when the legislation at issue infringes upon a right that "has its origin in the Montana Constitution, but is not found in the Declaration of Rights . . . ." *Powell*, ¶ 18. The statute at issue here does not infringe upon the rights of a suspect class or involve fundamental rights. *See Henry*, ¶ 32; *Powell*, ¶ 21. While we are sympathetic to any worker who suffers a loss of income, it would be inappropriate for us to disregard the well established principle that rational basis review applies to workers' compensation claims. We do not agree with Satterlee's contention that the facts presented justify a heightened level of scrutiny. Thus, rational basis is the appropriate level of scrutiny to apply to the instant case.

10

¶18     The final step in our equal protection analysis is to apply the appropriate level of scrutiny to evaluating the constitutional challenge. *Henry*, ¶ 32. The rational basis test requires that (1) the statute's objective was legitimate, and (2) that the statute's objective bears a rational relationship to the classification used by the legislature. Stated another way, the statute must bear a rational relationship to a legitimate governmental interest. *Henry*, ¶ 33.

¶19     Satterlee argues that we should follow the holding we arrived at in *Reesor* and determine that there is no rational basis to justify discrimination between the two classes. More specifically, Satterlee contends that "PPD and PTD benefits are legally indistinguishable" as they relate to § 39-71-710, MCA, and "[a]s with PPD benefits, PTD benefits should not automatically terminate at a specific age."

¶20     Lumberman's and Montana State Fund argue that *Reesor* is inapposite. They assert that because *Reesor* dealt with PPD benefits and not PTD benefits we should distinguish the instant case and adopt the WCC's analysis. Relying on our thorough differentiation of PPD and PTD benefits in *Rausch II*, Lumberman's and Montana State Fund argue that § 39-71-710, MCA, satisfies the rational basis test "because different rationales underlie PPD benefits and PTD benefits."

¶21     In the WCC's order denying Satterlee's motion for summary judgment, the Court stated that "when determining whether a rational basis exists for the specific portion of [§] 39-71-710, MCA, at issue in this case, the Court believes the analysis must differ from the analysis in *Reesor* because the *rationale* for PPD benefits and PTD benefits is

11

different." Because the statutory objective of § 39-71-710, MCA, is vital to our method of constitutional analysis, we now examine the purposes of the statute in detail.

¶22 PPD and PTD designations, and the benefits associated with each, vary in several relevant ways. First, the definition of each classification is markedly different. The WCA defines PPD as "a physical condition in which a worker, after reaching maximum medical healing: (a) has a permanent impairment established by objective medical findings; (b) is able to return to work in some capacity but the permanent impairment impairs the worker's ability to work; and (c) has an actual wage loss as a result of the injury." Section 39-71-116(24), MCA. PTD on the other hand, is defined as "a physical condition resulting from injury as defined in this chapter, after a worker reaches maximum medical healing, in which a worker does not have a reasonable prospect of physically performing regular employment." Section 39-71-116(25), MCA. Under this scheme, a claimant defined as PPD is in a very different situation from a claimant defined as PTD. While a PPD claimant will presumably be able to return to work and earn an income, a PTD claimant will not. This distinction is important because it underlies the second relevant difference between PPD and PTD benefits-namely, the purpose of the statute itself.

¶23 As we pointed out in *Rausch II,* the purposes of PPD and PTD differ greatly. Specifically, PPD benefits serve to restore the claimant to a pre-accident wage level for a limited amount of time while PTD benefits are meant to assist the claimant for his or her work life. *Rausch II,* ¶ 23.

12

[T]he PPD claimant, who is able to return to work, is entitled to wage supplement benefits, which serve to restore the claimant to a pre-accident wage level if the claimant has suffered a decrease in wages upon return to work. Additionally, the PPD claimant is entitled to an impairment award, which compensates the claimant for the permanent loss of physical function. This benefit is smaller than the total disability benefit, and is paid over a shorter period of time, but is designed to compensate a claimant who is able to return to work and re-commence earning a wage. The payment of an award to a claimant who returns to work is consistent with the Act's stated purpose of returning injured workers to the work force.

*Rauch II*, ¶ 23. As this Court pointed out, PTD benefits are not meant to supplement a claimant's wages rather they are intended to assist the worker who will never be able to return to work. *Rausch II*, ¶ 25.

[T]he statutory framework of the Act reveals the distinctly different purposes served by PPD and PTD benefits. PPD benefits compensate the worker for sustaining a partial disability by a smaller impairment award, and supplements the wages earned by the claimant upon return to work. PTD benefits do not contemplate a return to work, but, rather, provides a continuous, higher benefit which is paid over the work life of the totally disabled claimant. With these distinctions in mind, it would be inappropriate for this Court to make comparisons between these dissimilarly situated classes and then to order that either class is entitled to a benefit designed for a different class here, that PTD claimants are entitled to an impairment award. We conclude, therefore, that PPD and PTD claimants are not similarly situated . . . .

*Rauch II*, ¶ 25.

¶24 We agree with the WCC that the distinctions between PPD and PTD benefits are significant and thus require a different approach. As such, in the instant case we decline to follow *Reesor* to the extent that it dealt with PPD not PTD benefits. The two benefit classes are simply too different and serve such divergent purposes that equating the two

13

would be inappropriate. Thus, we will analyze the statute's constitutionality by examining the governmental interests that are relevant to PTD benefits only.

¶25 Lumberman's and Montana State Fund argue that the WCA in general and § 39-71-710, MCA, in particular, are rationally related to several legitimate interests. To make this argument they rely first on the public policy statement associated with the WCA that "[w]age-loss benefits are not intended to make an injured worker whole but are intended to assist a worker at a reasonable cost to the employer. Within that limitation, the wage-loss benefit should bear a reasonable relationship to actual wages lost . . . ." Section 39-71-105(1), MCA. In short, Lumberman's and Montana State Fund assert that the government has a legitimate interest in assisting the worker at a reasonable cost to the employer and in providing wage-loss benefits that bear a reasonable relationship to actual wages lost. In addition, Lumberman's also argues that § 39-71-710, MCA, bears a rational relationship to protecting the financial viability of the workers' compensation system.

¶26 Satterlee on the other hand, disputes any correlation between a legitimate government interest and § 39-71-710, MCA. Relying on *Reesor*, Satterlee contends that § 39-71-710, MCA, arbitrarily terminates their PTD benefits and that there is therefore no rational relationship between the government's interests and the statute. Satterlee also argues that the WCC improperly relied on cost containment in reaching its decision and that such reliance violates the Equal Protection Clause. We will examine each of these arguments in turn.

14

¶27 We begin with Satterlee's argument that *Reesor* requires a finding that § 39-71-710, MCA, is arbitrary and therefore unconstitutional. As we have explained here, as well as in *Rausch II*, PPD benefits and PTD benefits serve very different purposes and employ very different entitlement schemes. Therefore, we do not equate *Reesor* with the case at bar. Of most relevance to our discussion here is the difference between the timeframes over which PPD and PTD benefits are meant to serve. PPD benefits are temporary and are meant to terminate after a limited number of weeks. PTD benefits however, are meant to assist the worker over the course of his or her work life. *Rausch II*, ¶ 25. This difference is particularly important because it demonstrates the rationality of terminating PTD benefits at "retirement." Simply put, when an individual is considered retired, they have, by definition, ended their work life. In order to achieve the stated purpose of PTD benefits, which the legislature explained to be the provision of wage-loss benefits that bear a reasonable relationship to actual wages lost, it is sufficiently rational that such benefits would terminate when actual wages would normally terminate-upon retirement. The fact that retirement is statutorily defined at a given age for purposes of terminating PTD entitlements does not make the statute *per se* irrational.

¶28 As the WCC pointed out, "in the absence of § 39-71-710's limitations, [PTD benefits] would become a lifetime benefit." *Satterlee v. Lumberman's Mut. Cas. Co. et al.*, 2005 MTWCC 55. Indeed, without the statute, PTD benefits would run on until the claimant's death. Conversely, PPD benefits do terminate after a statutorily defined

15

number of weeks. As such, § 39-71-710, MCA, was irrational as it applied to PPD benefits because it disparately impacted similarly situated classes without serving any legitimate government interest. The termination of PTD based on SSRI eligibility on the other hand, is a sufficiently rational means of ensuring that PTD benefits do not become a lifetime benefit. As Lumberman's and Montana State Fund explained during oral arguments, nearly two-thirds of people who reach the age of 66 are no longer working, while seventy-five percent are no longer employed at age 70. With the statutory intent of § 39-71-710, MCA, in mind, it is rational for the workers' compensation system to terminate PTD benefits at a time when, statistically, most people's work-lives have ended. While this may not always seem fair, it is not unconstitutional. By acting to terminate benefits as it does, § 39-71-710, MCA, rationally advances the governmental purpose of providing wage-loss benefits that bear a reasonable relationship to actual wages lost.

¶29 We now turn to the second part of Satterlee's equal protection argument in which they assert that the WCC erred in its reliance on cost containment. We readily concede that cost alone is insufficient to justify the disparate treatment of similar classes. However, our jurisprudence does not go so far as to say cost to the workers' compensation fund may never be considered. *Heisler v. Hines Motor Co.*, 282 Mont. 270, 283, 937 P.2d 45, 52 (1997). It is well established that the control of workers' compensation costs is a legitimate government interest that may constitutionally be pursued by the legislature. *Stratemeyer I*, 259 Mont. at 155, 855 P.2d at 511; *Heisler*,

16

282 Mont. at 284, 937 P.2d at 52. As long as cost containment is not the sole reason for disparate treatment and it is achieved by a rational means the legislature may attempt to improve the viability of the workers' compensation system without offending the Equal Protection Clause. *Stratemeyer I*, 259 Mont. at 155, 855 P.2d at 511; *Powell*, ¶ 30. The WCC's discussion of cost in this case was appropriate.

¶30 While the parties dispute the precise economic impact striking down § 39-71-710, MCA would have on the workers' compensation system no party contends that it would not be measureable.[4] While this alone cannot justify disparate treatment, the WCC appropriately relied on additional factors in reaching its conclusion. Namely, the WCC pointed to the government's interest in assisting the worker at a reasonable cost to the employer as well as to the interest in providing benefits that bear a reasonable relationship to actual wages lost. Because the WCC's cost containment analysis is rational and more importantly, because it was coupled with a finding that additional legitimate interests are served by the statute we conclude that the WCC did not err when it relied in part on cost containment in its analysis.

¶31 Thus, with regard to Satterlee's equal protection claim, we conclude that § 39-71-710, MCA, satisfies the Montana Constitution. As we have discussed, the statute is rationally related to the legitimate government interest in assisting the worker at a

---

[4] There is some discussion in the parties' briefs as to the financial impact § 39-71-710, MCA, has on the viability of the workers' compensation fund. However, for the purposes of this prong of our analysis the precise amount is not relevant. It is well established that the workers' compensation fund's financial viability is a legitimate government interest. *Stratemeyer I*, 259 Mont. at 155, 855 P.2d at 511 (1993).

reasonable cost to the employer so that the wage-loss benefit bear a reasonable relationship to actual wages lost. We now turn to Satterlee's claim that § 39-71-710, MCA, violates their right to substantive due process. In doing so we will address Satterlee's argument that § 39-71-710, MCA, terminates benefits based on age as well as the assertion that affirming the WCC will result in an absurdity.

¶32    2.    Did the Workers' Compensation Court err in determining that § 39-71-710, MCA, does not violate Satterlee's substantive due process right?

¶33    "Substantive due process analysis requires a test of the reasonableness of a statute in relation to the State's power to enact legislation." *Powell*, ¶ 29 (citing *Newville v. State, Dept. of Family Serv.*, 267 Mont. 237, 250, 883 P.2d 793, 801 (1994)). "Since the State cannot use its power to take unreasonable, arbitrary or capricious action against an individual, a statute enacted by the legislature must be reasonably related to a permissible legislative objective in order to satisfy guarantees of substantive due process." *Powell*, ¶ 29 (citations omitted).

¶34    In both the briefs and at oral argument Satterlee questioned the reasonableness of the statute's application with respect to PTD claimants over the age of 65 who are eligible to receive SSRI. In doing so, Satterlee asserts that there is an inconsistency in allowing claimants who have worked less, and therefore do not qualify for SSRI, to continue to collect PTD benefits while terminating those claimants who have worked more, and are therefore eligible SSRI. While we are mindful of this issue we do not think it rises to the level of an absurdity so that we would be required to hold § 39-71-710,

MCA, unconstitutional. We have long held that "[t]he power of the legislature to fix amounts, time and manner of payment of workers' compensation benefits is not doubted." *Ingraham v. Champion Intl.*, 243 Mont. 42, 48, 793 P.2d 769, 772 (1990). This principle coupled with the constitutional role of this Court to presume the statute to be constitutional and look to any possible legitimate purpose requires us conclude that it is within the legislature's perogative to determine that PTD benefits should terminate upon a claimant receiving or becoming eligible to receive SSRI. *Stratemeyer I*, 259 Mont. at 152, 855 P.2d at 510. Although the issue raised by Satterlee is legitimate, it not irrational that the legislature may have decided to allow the most vulnerable claimants, those who do not qualify for SSRI, to continue to receive PTD benefits even after they reached the age at which they would otherwise be terminated. That the legislature did not enunciate this specific purpose does not mean that it should not be considered. As we have stated "[t]he purpose of the legislation does not have to appear on the face of the legislation or in the legislative history, but may be any possible purpose of which the court can conceive." *Stratemeyer I*, 259 Mont. at 152, 855 P.2d at 510-11. Our role is not to second guess the prudence of a legislative decision. As such we cannot strike down § 39-71-710, MCA, as a violation of substantive due process simply because we may not agree with the legislature's policy decisions. That we have identified at least one "possible legitimate purpose" is enough in this instance for us to conclude that affirming the WCC will not result in an absurdity.

19

¶35     Satterlee also argues that § 39-71-710, MCA, terminates PTD benefits based on age and that our holding in *Reesor* prohibits such discrimination.  As we have already explained, we find the reasoning in *Reesor* to be inapplicable to the case at bar.  PPD and PTD benefits and their corresponding purposes are too different to equate them with one another.  As we noted earlier, the legislature's decision to terminate PTD benefits when a claimant receives or become eligible to receive SSRI is based on the rational grounds.

¶36     Finally, Satterlee urges that "[b]y terminating [Satterlee's] PTD benefits because of [age], § 39-71-710, MCA violates [their] substantive due process rights because there is no *quid pro quo* for the PTD benefits . . . lost after age 65."  Satterlee cites *Stratemeyer v. Lincoln Co.*, 276 Mont. 67, 75, 915 P.2d 175, 179 (1996) (*Stratemeyer II*) in support of the proposition that an employee's rights to file an action in tort "should not be deemed taken away except where something of value has been put in their place."  Conversely, Lumberman's and Montana State Fund argue that the *quid pro quo* principle of a bargained for exchange is satisfied because claimants over the age of 65 may still "receive no-fault medical benefits and temporary total disability benefits as long as they are due."

¶37     As this Court has held on several occasions, the enactment of the Workers' Compensation Act was essentially a compromise between industry and labor so that labor received guaranteed no-fault recovery, and industry was relieved of the possibility of large and potentially uncapped recoveries in the tort system.  *Stratemeyer II*, 276 Mont. at 74, 915 P.2d at 179 (citing *Lewis & Clark Co. v. Indus. Accident Bd.*, 52 Mont. 522, 179

20

P.499 (1916)). As with all legislative compromises, the WCA is not infallible and the legislative decisions made in adopting the WCA are subject to honest debate. Nevertheless, once a statute has been duly approved by the legislative branch, this Court's role is not one of second guessing the prudence of the conclusions reached. *Stratemeyer I*, 259 Mont. at 147, 855 P.2d at 506. It is from this starting point that we address Satterlee's *quid pro quo* argument.

¶38 Black's Law Dictionary defines *quid pro quo* as "[a]n action or thing that is exchanged for another action or thing of more or less equal value." *Black's Law Dictionary* 1282 (Bryan A. Garner ed., 8th ed., West 2004). While the legislature has rationally concluded that PTD benefits should terminate once a claimant has received or becomes eligible to receive SSRI, the statute still provides for those claimants who are over 65 when they suffer a work place injury by allowing them to receive temporary total disability benefits, an impairment award and no-fault medical benefits. Section 39-71-710, MCA. That this remedy satisfies the *quid pro quo* by providing the claimant who is over 65 with a benefit of "more or less equal value" to their forgone rights in tort is subject to honest debate. However, such a debate involves issues and decisions about public policy that are clearly of the sort much better suited to the halls of the legislature. Furthermore, such a claimant is not before us in the case at bar. Here, all three Appellants suffered work place injuries prior to becoming eligible for SSRI and, in fact, received PTD benefits for multiple years. Suffice it to say that while the claimant who suffers a work related injury after becoming eligible for SSRI may not be able to qualify

21

for PTD benefits, he or she is still eligible for benefits of sufficient significance to satisfy the *quid pro quo* principle.

¶39    Furthermore, Satterlee's claims that substantive due process has been violated by the lack of a *quid pro quo* mistakenly ignores the fundamental compromise that was reached by legislature's enactment of the WCA.    Namely, in exchange for no fault recovery, employers gained the predictability of consistent workers compensation payments that would be capped in a way that personal injury tort claims were not.    As such, it is sufficiently rational that the legislature enacted § 39-71-710, MCA.    Without such a limitation on the duration of PTD benefits, the cap and predictability of payments that employers bargained for in the WCA would be lost thus denying the employers, the benefit of the *quid pro quo*.    Although we may empathize with Satterlee's economic loss, we have long held that "a worker's right to compensation benefits is not fundamental." *Ingraham*, 243 Mont. at 48, 793 P.2d at 773 (citing *Cottrill*, 229 Mont. at 44-43, 744 P.2d at 897 (1987)).    Thus, with respect to Satterlee's *quid pro quo* assertions, we hold that § 39-71-710, MCA, does not violate their substantive due process rights.

¶40    We conclude that § 39-71-710, MCA, is constitutional under the Substantive Due Process and Equal Protection Clauses of the Montana Constitution.    For this and for the reasons discussed above, we hold that the WCC properly granted Montana State Fund's motion for summary judgment.

¶41    Affirmed.

22

/S/ W. WILLIAM LEAPHART

We concur:

/S/ MIKE McGRATH
/S/ JOHN WARNER
/S/ PATRICIA O. COTTER
/S/ JIM RICE


Justice Brian Morris dissents.

¶42    I reluctantly dissent.  The Utah Supreme Court recently struck down a similar offset provision on equal protection grounds.  *Merrill v. Utah Labor Comm'n*, ___ P.3d ___ (Utah 2009).  The Utah offset kicked in once an injured worker had received 312 weeks of workers' compensation. *Merrill*, ¶ 1.  Montana's offset law contains no similar delayed trigger.  It applies as soon as the injured worker becomes eligible for SSRI benefits.  Section 39-71-710, MCA.  The Utah offset reduced by fifty percent the amount of workers' compensation benefit that the injured worker may receive.  *Merrill*, ¶ 1. Montana's offset eliminates entirely any PTD benefits for the injured worker.  Section 39-71-710, MCA.  The Utah court determined nevertheless that this offset provision could not withstand rational basis scrutiny in that it unfairly singled out  workers' compensation benefits of injured workers over the age of 65 who qualified for social security benefits.  *Merrill*, ¶ 1.  I agree with the analysis of the Utah Supreme Court in *Merrill* and would strike down the offset provision of § 39-71-710, MCA, for similar reasons.

23

¶43     This Court recently struck down without hesitation under rational basis review a maximum hiring age for new firefighters in § 7-33-4107, MCA, on the ground that the cut-off age of 34 was "wholly arbitrary." *Jaksha v. Butte-Silver Bow County*, 2009 MT 263, ¶ 24, 352 Mont. 46, 214 P.3d 1248. The Court rejected out of hand the county's argument that the maximum hiring age prolonged the productive life of a firefighter and enabled him to work more safely and efficiently as his physical capabilities declined with age. *Jaksha*, ¶ 21. The Court concluded that as long as the applicant had mastered the written and physical tests and successfully had completed the interview process the maximum hiring age bore no rational relationship to the statute's objective of protecting the safety of other firefighters and the public. *Jaksha*, ¶ 24.

¶44     The same "rational scrutiny with bite" approach used in *Jaksha* surely would invalidate the legislature's similar effort to use SSRI eligibility as a proxy for retirement. *See* G. Gunther, *Cases and Materials on Constitutional Law*, 12th Ed. at 462 (Foundation Press 1992). The Court instead employs a toothless analysis that permits the legislature to advance the perfectly legitimate task of protecting the economic viability of the workers' compensation system through the illegitimate means of penalizing injured workers who have qualified for SSRI. The Court applies its toothless approach through its depiction of workers' compensation and SSRI solely as wage loss replacement systems.

¶45     The Court reaches this result without regard for whether the amount of SSRI for which an injured worker might be eligible even remotely approaches the benefits that the

24

workers' compensation system provided. I could accept some coordination of benefits to offset the receipt of SSRI, similar to what Montana law does with respect to social security disability benefits. Sections 39-71-701(5), and 39-71-702(4), MCA. Section 39-71-701(5), MCA, reduces, but does not eliminate, workers' compensation benefits for temporary total disability by an amount roughly equal to one-half of the federal benefits. Section 39-71-702(4), MCA, imposes the same reduction on permanent total disability benefits. The offset contained in § 39-71-710, MCA, however, eliminates completely an injured worker's entitlement to any benefits.

¶46 The court in *Merrill* recognized that SSRI serves an entirely different purpose from the workers' compensation scheme. *Merrill*, ¶ 26. The court noted that "[n]either social security retirement benefits nor workers' compensation are solely wage replacement measures." *Merrill*, ¶ 29. A mere five years ago this Court declared without equivocation that "social security retirement benefits are not wage loss benefits." *Reesor v. Mont. State Fund*, 2004 MT 370, ¶ 24, 325 Mont. 1, 103 P.3d 1019. The Court nevertheless determines today that SSRI eligibility constitutes a reasonable proxy for retirement and analyzes the offset in § 39-71-710, MCA, under the premise that SSRI benefits replace the wage loss benefits provided under the workers' compensation system.

¶47 The court in *Merrill* cited at least four distinctions between the workers' compensation system and SSRI. *Merrill*, ¶¶ 30-33. First, the programs compute benefits "on entirely different bases and compensate for entirely different eventualities." *Merrill*,

25

¶ 30, quoting *West Virginia v. Richardson*, 482 S.E.2d 162, 168 (W.Va. 1996). This Court in *Reesor* also previously defined workers' compensation and SSRI as "two distinct programs" and rejected the notion that they could "offset one another due to the fact that both programs are based on completely different concepts." *Reesor*, ¶ 23.

¶48 The *Merrill* court explained that Utah had adopted workers' compensation as a tort liability reform measure. *Merrill*, ¶ 24. Workers' compensation benefits represent a substitute for access to the courts for redress for torts "and are not a welfare benefit for wage loss." *Golden v. Westark Community College*, 969 S.W.2d 154, 158 (Ark. 1998). Employers pay premiums for insurance from which injured workers receive benefits "in exchange for the employee's forbearance from suing the employer in tort." *Golden*, 969 S.W.2d at 158.

¶49 Injured workers in Montana receive compensation for damages incurred by a work related injury in the form of lost wages, medical services, nursing services, hospital services, and medicines. Section 39-71-704, MCA. Montana's workers' compensation system provides no means for a worker to "opt out" of the system unless the employer fails to pay to the workers' compensation fund, in which case the injured worker may bring a civil action. Section 39-71-515, MCA. Workers' compensation provides the sole remedy for injured workers. *Reesor*, ¶ 22; § 39-71-411, MCA. It cannot be described fairly as a "wage loss" system.

¶50 Second, the *Merrill* court determined that unlike workers' compensation, SSRI benefits are not paid in connection with any injury or disability. *Merrill*, ¶ 31. The

26

federal government pays SSRI benefits only after a person has contributed to the fund. *Merrill*, ¶ 31. The Arkansas Supreme Court likewise noted that "'[s]ocial security retirement benefits are provided to persons over age sixty-five regardless of injury . . . . These benefits are not disability benefits, but are old-age entitlements serving the same function as pension payments.'" *Golden*, 969 S.W.2d at 158 (quoting *Industrial Claim Appeals Office v. Romero*, 912 P.2d 62, 67-68 (Colo. 1996)); *see also Wal-Mart Stores, Inc. v. Keel*, 817 So. 2d 1, 10 (La. 2002). Social security retirement benefits allow participants to receive income after age 65 only if they have contributed adequately to the fund.

¶51 As this Court explained in *Reesor*, social security benefits "provide the recipient with supplemental income *after* he contributes to the program throughout his working life." *Reesor*, ¶ 22 (emphasis in original). The West Virginia Supreme Court likewise recognized that SSRI benefits represent "additional compensation paid by insurance as a result of having worked some period of time at some average taxable salary, except as the payments reflect a return of the recipient's wage contributions to the system." *Richardson*, 482 S.E.2d at 166. SSRI benefits do not compensate for a workplace injury or replace elements of damage "that might be recovered in a common law action for such an injury." *Richardson*, 482 S.E.2d at 166.

¶52 Third, the *Merrill* court cited Congress's repudiation of the notion that SSRI constitutes a wage replacement program through its enactment of the Senior Citizen's Freedom to Work Act, 42 U.S.C. § 402 (2000). *Merrill*, ¶ 32. Not surprisingly, this

27

Court in *Reesor* reached the same conclusion. It too noted Congress's decision to eliminate the earnings limit for workers over age 65 and thereby eliminate the reduction in social security benefits due to wages regardless of the amount of wages earned by persons 65 and older. *Reesor*, ¶ 24. The court in *Golden* explained that SSRI benefits have evolved into a benefit more associated with advanced years than a replacement for wage loss in light of the fact that a worker over age 65 can supplement his social security retirement benefits by income from gainful employment. *Golden*, 969 S.W.2d at 158.

¶53 The offset contained in § 39-71-710, MCA, prevents an injured worker in Montana from supplementing his SSRI benefits. The injury prevents the worker from continuing to earn a wage and the offset deprives the injured worker of the wage replacement benefit to which he otherwise would be entitled. This Court noted the irrationality of allowing a forty-year-old injured worker to receive permanent partial disability benefits while a similarly situated sixty-five-year-old worker with an identical injury would receive only an impairment award "due to the fact that he ha[d] reached social security retirement age." *Reesor*, ¶ 23. The complete offset in § 39-71-710, MCA, for PTD benefits heightens the irrationality. A worker injured after he has reached eligibility for SSRI receives no wage replacement benefits at all. The worker cannot sue in tort to recover for these losses, however, as workers' compensation provides the sole remedy. Section 39-71-411, MCA.

¶54 Fourth, the *Merrill* court determined that the public policy in the Age Discrimination in Employment Act, 29 U.S.C. § 623(a)(1) (2006) (ADEA), further

28

supports the notion that social security retirement benefits represent something different from wage loss benefits "and are not duplicative of workers' compensation benefits." *Merrill*, ¶ 33. The ADEA, among other matters, prohibits an employer from discriminating against any employee "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." *Merrill*, ¶ 33. This provision makes it improper for an employer "to compel its older employees to substitute retirement benefits for disability benefits." *Merrill*, ¶ 33. Section 39-71-710, MCA, of course, forces an older employee to substitute entirely SSRI benefits for PTD benefits.

¶55 This forced substitution raises the specter of whether the workers' compensation scheme provides an adequate substitute remedy "for that which might be available in the tort system for such an injury." *Richardson*, 482 S.E.2d at 168. The offset provision of Section 39-71-710, MCA, singles out injured workers who have contributed to the economy by working the required number of years to qualify for SSRI benefits and punishes these injured workers by eliminating their workers' compensation benefits. Though the economic viability of the workers' compensation scheme represents a worthy and legitimate state interest, I fail to see how "workers' compensation benefits paid for loss of the ability to earn the same wages and a retirement benefit under social security are duplicative in any respect." *Golden*, 969 S.W.2d at 159.

¶56 The workers' compensation system in Montana constitutes a grand bargain in which injured workers forego the possibility of larger awards potentially available

29

through the tort system (the quid) in exchange for a no fault system that provides more certainty of an award (the quo). *Sitzman v. Shumaker*, 221 Mont. 304, 307-08, 718 P.2d 657, 659 (1986). The offset provision of § 39-71-710, MCA, eviscerates the quid without returning the quo. The Court concedes that this point "is subject to honest debate." Opinion, ¶ 38. I would resolve this honest debate in favor of the injured workers who have foregone their right to seek damages through the tort system and now receive nothing in the form of workers' compensation benefits upon their eligibility for SSRI.

/S/ BRIAN MORRIS

Justice James C. Nelson joins in the foregoing dissent.

/S/ JAMES C. NELSON